MONTGOMERY, P. J., concurs.
PUTNAM, J., concurs in the judgment.

BERRY, APPELLEE, *v.* INDUSTRIAL COMMISSION OF OHIO, APPELLANT.

(No. 5519—Decided May 15, 1957.)

*Mr. James F. Henderson,* for appellee.
*Mr. William Saxbe,* attorney general, *Mr. James L. Young, Mr. Gus Tarian* and *Mr. Brown Pettit,* for appellant.

BRYANT, J. The principal question to be decided in this case is whether expert medical testimony is required, and, if so, whether there is a want of such testimony requiring a reversal of the verdict and judgment of the court below. Curtis M. Berry, plaintiff, appellee herein, was employed as an unskilled laborer by the Continental Grain Company during the month of September 1948. He had been so employed several months prior thereto and continued to be employed subsequent thereto. On September 27, 1948, in the course of his employment he was working on a grain conveyor fastening the cover thereon. The grain conveyor apparently was built on an incline and appears to have been rectangular in shape. It appears to have had a width of from ten to twelve inches with a ledge or catwalk on each side, and from ten to twelve inches in width. Berry was helping a skilled workman and at the time of the accident was astride the conveyor approximately twelve feet above the ground. He and the other workman were fastening the cover on the conveyor by tightening bolts which held it in place. The accident was described by Berry, whose testimony appears in the rehearing record.

Asked concerning his duties on September 27, 1948, Berry testified:

"Q. What duties were you performing on that day? A. Well, I was helping another man put the lids on soybean meal conveyor."

As to the particular place where he and the other man were working, Berry testified:

"Q. And the conveyor went up an incline? A. Yes, sir.

"Q. What was the height? A. Where I was at, I imagine it was about 12 feet off the ground, but it got higher than that.

"Q. That is where you were putting the lid on? A. Yes, sir."

With reference to the situation existing, Berry continued:

"Q. What was the character, what was the situation as to where you stood and how did you do it and so forth? A. Right out in the open, and we had to crawl up a ledge about this wide.

"The referee: About 12 inches, you would say?

"The witness: Approximately 12, I would say.

"A. And the ledge, you had to put your feet on got

astraddle of the lid to put the bolts in and I had only worked a short time, this happened at 12:45.''

Asked to describe the accident, Berry testified:

''Q. What happened? A. My left foot slipped.

''Q. Slipped from what? A. From the ledge of that conveyor which was three-quarters of an inch or an inch.

''Q. What were you doing at that time? A. I had wrenches, tightening up bolts.''

As to events immediately following the accident, Berry testified:

''Q. After you say your foot slipped off this ledge, what did you do, what happened to you? A. I had to get down off there, I scooted down off there the same way I went up.

''Q. What do you mean, scooted? A. Scooted back the best way I could on my hind end. I was in awful shape.'' (Part of answer objected to.)

''Q. You say you scooted back out of there? A. Yes.

''Q. Where did you scoot to? A. Down to the cement platform where I started from.''

Berry then testified that he reported the accident either that day or the next to Jack O'Neil, the superintendent. He said he went over in the vicinity of the boiler room and sat down and rested and later went home and went to bed. Asked to describe the trouble he seemed to have, Berry testified:

''Q. What, from your own checkup, what trouble did you seem to have? A. Just had an awful pain in my back, left side of my spine.

''Q. How do you describe that pain? A. Awful pain, worse than a toothache.

''The referee: Stand up and point to the spot where you had the pain.

''The witness: Right there.

''The referee: He indicates the left side of the back slightly below the beltline in the area roughly of the hip joint.''

Berry gave a further description of his condition as follows:

''Q. What was your condition, how did you feel, what did you do? A. I didn't feel good.

''Q. But how, so we know what you are talking about? A.

I couldn't straighten up, I had to walk bent over, felt awful. I had a lot of pain in my back."

Berry testified further that in the days following the accident he was stooped and had a lot of pain in his back and on the fourth of October he went to the office of a physician whom the company procured for him, Dr. Joseph C. Forrester, who "put a bandage on and taped my back." Berry testified that he recovered and could walk "some better, but I was still stooped over for quite awhile." As to his condition at the time of the rehearing, Berry testified:

"Q. What is the condition at the present time that you know? A. I have a lot of pain in my back at the present time, sharp pain.

"Q. Is it all the time or once in awhile? A. All the time.

"Q. What have you been doing for it? A. Haven't been doing anything for it, getting a lot of rest for it when I get home."

Berry continues with his description of his condition at the time of the rehearing as follows:

"Q. Describe that pain that you say you have now in there, the best you can? A. Just a sharp pain.

"Q. What does it do to you? A. Makes me feel awful.

"Q. Does it affect your movements in any way? A. I can't get around as good as I did before. I am tired all the time."

The parties stipulated into the record mutual exhibit X, which is the claim for compensation and supporting material (Industrial Commission C-1), filed by Berry on September 13, 1949. The date of the claimed injury was September 27, 1948. Under the statutory provisions, Berry had two years within which to file the claim. It would appear that he filed slightly under one year after the date of the claimed injury. There appears to be no merit to the claim that he filed too late.

Reference is made by defendant to injuries allegedly suffered by plaintiff on two other occasions, one approximately fifteen years prior and the other shortly after September 27, 1948. It appears to be the contention of defendant that unless Berry has established complete recovery from the injuries sustained in 1933 he cannot recover for an injury sustained September 27, 1948. Berry worked several months prior to Sep-

tember 27, 1948, and the record indicates that he was well regarded and did a full day's work. The foregoing contention of defendant is without merit.

Some question is raised in defendant's behalf as to whether the accident occurred on September 27, 1948, or some other date. We note that when Berry's counsel moved to amend to show the date of injury as September 27, 1948, counsel for the defendant at that time stated they had no objection to the amendment being made. That being the case it is too late to raise the question at this time.

Defendant claims that medical testimony is required in a case such as this. This is on the theory that in order to determine causal connection where a field of scientific inquiry is involved, is beyond the scope of mere laymen. Even if we assume such requirement to apply here, the record is not devoid of medical testimony. It was Berry's testimony, undenied in the record so far as we could learn, that the company had no regular doctor but that they procured for him the services of Dr. Joseph C. Forrester of Columbus. In mutual exhibit X, in the rehearing record, which was stipulated into the record without objection of either side, there appear several questions and answers over the signature of Dr. Forrester, under the heading "Attending Physician's Report." The third question is as follows:

"Give accurate description of nature and extent of injury."

The answer of Dr. Forrester to this question is as follows:

"Foot slipped while on mill conveyor, twisting back. Tenderness over rt. sacroiliac region on pressure—pain same region on back motion."

Dr. Forrester was not called by either side at the time of the rehearing but a stipulation with reference to his testimony appears in the rehearing record. From this we learn that Dr. Forrester is a duly licensed physician, that his records show that Berry visited his office October 4, 1948, and further that Dr. Forrester would say "that at that time he examined claimant's back and the back showed evidence of an acute right sacroiliac sprain. That he did not take X-rays. * * *" If any testimony were needed by a physician as to causal connection be-

tween the claimed accident and the injury resulting, the above would appear clarly to satisfy such rule. Furthermore, the defendant caused Berry to undergo a physical examination on December 7, 1953, by a physician employed by it—Dr. Donald F. Bowers—who apparently made a very thorough examination. Dr. Bowers was asked to describe the portion of the body where the claimed injury occurred and gave the following reply:

"Q. Now, Doctor, where is the sacroiliac joint located in the body? A. The sacroiliac joint is located in the back and it makes the sacrum where it joins the two iliac bones and forms the posterior portion of the pelvis. It is that joint which completes the cycle in the back. The sacrum is the lower part of the spine, the spine being divided into the cervical portion of the neck, the thoracic portion of the chest, the lumbar portion, the five vertebrae below the ribs in the back, and then the sacrum, as the fan shaped or triangular shaped fusion of five or six vertebrae, and this is called the sacrum. The base of the triangle is upward, and the point downward. On the point, there are four or five little vertebrae usually partially bone cartilage which is called the coccyx, but there this triangular bone joins the pelvis to form the cycle of the pelvis of the back and the ilium which is the two fan-shaped bones at either side of the pelvis. It joins this joint which is a fixed joint. It is not a movable joint. It is called the sacroiliac joint."

Dr. Bowers' diagnosis at the time of his examination was "generalized arteriosclerosis or hardening of the arteries, and left sacroiliac disease." Dr. Bowers further explained his diagnosis as follows:

"The X-rays that we took of him revealed one thing, that there was calcification or hardening, in the abdominal area which indicated that he had a fairly well advanced hardening of the arteries or arteriosclerosis. X-rays of the spine and the lumbosacral joint and the sacroiliac joints showed no evidence of any arthritis or any other bone disease or lesion, and upon this we based our diagnosis of an acute sacroiliac disease or sacroiliac sprain."

Dr. Bowers first viewed the claimant over five years after the time of the accident and more than four years after the defendant was notified of Berry's claims by the filing of the form C-1.

As above pointed out we do not believe this is the type of case where medical testimony is indispensible for it is not claimed here that one part was accidentally hurt and another part as a result was injured or death caused. A number of cases cited by the defendant may be distinguished upon the facts. In the case of *Drakulich* v. *Industrial Commission*, 137 Ohio St., 82, 27 N. E. (2d), 932, the claimant in June 1932 suffered sprains of the ligaments, tendons and muscles in his back, sides and abdomen. One year later it was discovered he had cancer and in August 1933 he died of cancer of the liver. His survivors claimed the cancer of the liver was caused by the sprained ligaments, tendons and muscles in his back, sides and abdomen. The Supreme Court held that a causal relationship must be established and this by the testimony of expert medical witnesses for the reason that the question involved a field of scientific inquiry.

In the case of *Aiken* v. *Industrial Commission*, 143 **Ohio** St., 113, 53 N. E. (2d), 1018, the claimant suffered a compensable knee injury and six years later died of myocarditis. It was claimed that the knee injury six years before caused the myocarditis. The Supreme Court held that expert medical testimony to establish causal connection was required in such case. It should be noted that in both the *Drakulich case* and the *Aiken case* there was no dispute or argument that injury had occurred directly to a part or parts of the body. It was when the attempt was made to claim that another part of the body was injured that expert medical testimony was required.

Somewhat similar is the case of *Brandt* v. *Mansfield Rapid Transit, Inc.*, 153 Ohio St., 429, 92 N. E. (2d), 1, in which the claimant suffered injuries when her motor vehicle was struck by a motor bus of defendant. It was claimed in that case that as a result of the injuries, claimant suffered a premature menopause at the age of 36 years. This case is also distinguishable as are the other two for the reasons above set forth.

In the case of *Stacey* v. *Carnegie-Illinois Steel Corp.*, 156 Ohio St., 205, 101 N. E. (2d), 897, claimant, while working in a blacksmith shop, said a small particle, no larger than a pinhead, blew into his eye. This occurred in July 1944 and in October 1947 an eye specialist, who examined the claimant, testified

he had "bilateral cataracts in both eyes" and that they "were probably of a senile type." Again the Supreme Court held that expert medical testimony was required to establish causal connection in such case.

The case of *Pfister* v. *Industrial Commission,* 139 Ohio St., 399, 40 N. E. (2d), 671, relied upon by defendant, sheds but little light upon this question for the reason, as the Supreme Court found, there was no evidence whatever of an injury accidental in origin or cause or of a sudden and unexpected happening at a particular time.

The jury heard all the evidence in the case and was given instruction as to the law which appeared to be satisfactory to both sides. For the reasons above set forth we feel the errors assigned are not well taken and should be overruled and the judgment of the court below affirmed.

*Judgment affirmed.*

PETREE, P. J., and MILLER, J., concur.